**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MYRON HAMILTON,                                    Case No. 1:13-cv-124

       Plaintiff,                                    Bowman, M.J.

   v.

LOCAL UNION NO. 1347 OF THE
INTENATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO, et al.,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

On February 15, 2013, Plaintiff Myron Hamilton ("Hamilton") filed suit against Defendants under the Labor Management Relations Act, 29 U.S.C. § 185.  Plaintiff is a former employee of Defendant Duke Energy Ohio, Inc. ("Duke") as well as a member of Defendant Local Union No. 1347 of the International Brotherhood of Electrical Workers, AFL-CIO ("the Union").  Plaintiff's complaint alleges that Duke violated the Collective Bargaining Agreement ("CBA") that exists between Duke and the Union when Duke terminated Plaintiff's employment.  Plaintiff further alleges that the Union violated its duty to fairly represent him in its efforts to have him reinstated to his former employment.

The Union and Duke filed separate motions for summary judgment, to which Plaintiff filed a combined response. (Docs. 54, 55, 62).  Both the Union and Duke filed reply memoranda. (Docs. 70, 71).  The parties have consented to disposition of this case by the undersigned magistrate judge.  *See* 28 U.S.C. §636(c) and Doc. 13.  For the reasons that follow, the Court concludes that both Defendants are entitled to judgment as a matter of law.

**I. Background**

Defendants have filed Proposed Undisputed Facts, to which Plaintiff has responded. (Docs. 54, 55). The Court adopts those facts expressly admitted by Plaintiff. (Docs. 67, 68). To the extent that any material facts have been disputed, they have been construed in favor of the Plaintiff.

Hamilton began his employment with Duke in January 1989 at a time when the company was called The Cincinnati Gas & Electric Company. Over the years, Hamilton held various positions with Duke, but eventually became a Lineman. He continued to work for Duke until Duke terminated his employment on June 27, 2012. At the time of his termination, Hamilton worked as a Senior Lineman at the Miamitown location, with 7 to 8 employees working under his direction.

Hamilton and his crew were assigned to replace an electrical pole on State Street by Steve Laub, a scheduling specialist who provided instructions describing what the job entailed and how they were to do it. Paul Greve was Hamilton's direct supervisor. Hamilton and his crew were directed to remove an existing 40 foot pole, erect a new pole, remove the old transformer, transfer conductors to the new pole, and install a new transformer.

On May 9, 2012, Myron Hamilton and a crew began work on the State Street job. On May 14, 2012, Hamilton returned to the site to continue the work, along with three others. Following completion of the installation of the new pole, Plaintiff continued work on the new conductor. On Tuesday, May 15, 2012, Plaintiff and a crew returned and finished their work at State Street prior to traveling to Bond Road to complete their next

2

job. When they left State Street, they left the old and new transformers banked together. No one instructed them to do so.

Banking transformers is a process used to temporarily attach (bank) two transformers together on an electric pole to avoid a temporary disruption in power during construction jobs. Hamilton does not dispute that after completion of construction, the transformers are to be unbanked and one transformer should be removed. A written work standard used by Cinergy, a predecessor to Duke for which Hamilton also worked, requires transformers to be unbanked. Duke did not either formally adopt or repudiate that work standard after it assumed operations but continued the same or similar customs and practices, to the extent that transformers were occasionally banked under certain conditions.

When questioned about Duke's written standards, Hamilton initially suggested, "I think I have seen" a work standard that said to leave transformers banked. He then contradicted that testimony by testifying that he had not seen a written standard "that I can recall," before finally testifying that he "can't recall that I have or haven't" ever seen such a work standard. (Hamilton Depo., Doc. 53 at 162-163).[1] Notwithstanding this equivocal testimony, Hamilton does not dispute the temporary nature of any conditions that would warrant banking.

On Wednesday, May 16, the day after completion of the State Street work, Laub drove by and noticed that the transformers were still banked together, and called Greve to notify him of that fact. Greve immediately asked Hamilton why the transformers were

---

[1] Hamilton's entire deposition was filed under seal, but the limited portions of testimony quoted herein are not within a category of information requiring protection from disclosure in the public record.

left banked, and instructed Hamilton to go unbank them.  Because Hamilton was concerned he would miss a meeting if he traveled to State Street, he asked Mark Lewis and John Hoskins, who were working nearby, to go unbank the transformers.  Witness accounts vary concerning whether Lewis and Hoskins committed to the task or merely agreed to "try."  Hamilton testified that even though Lewis and Hoskins indicated they would have trouble getting to the task, Lewis ultimately reassured him, "We'll get it, Buddy. Go on.  Quit freaking out."  (Hamilton Depo. at 127:15-21).  Regardless, Lewis and Haskins forgot and did not unbank the transformers.  Lewis testified that Hamilton never followed up with them to see if they completed the task.[2]

On May 31, 2012, Grady Hamilton (Plaintiff's brother) and Marc Lewis completed the State Street job.  After returning from that job, Grady notified Greve that the transformers had been left and were still banked upon their arrival, and that when they pulled up there was a loud buzzing sound.

On June 4, 2012, Hamilton learned that the transformers had not been unbanked when Greve called a meeting to discuss why Plaintiff had left the transformers banked, and had failed to correct the problem as instructed.  Hamilton responded by saying that they must have forgotten to unbank the transformers and that it wasn't a big deal.  In response to the query why he did not go unbank them as instructed on May 16th, Hamilton said he had to stop and get fuel, and had a long drive, so he asked someone else to do it for him.

---

[2]Hamilton disputes Lewis's account only to the extent that Hamilton testified he couldn't recall whether he followed up.  This is not a material factual dispute in light of Hamilton's concession that he remained unaware that Lewis and Hoskins hadn't unbanked the transformers until he was told on June 4.

4

About 30 minutes later, Greve and Laub were in the office when they heard yelling outside.  They discovered Plaintiff and his brother Grady arguing loudly, standing face to face.  Greve instructed them to return to work, and notified his supervisor, Susan Mearns, about the incident.  Duke conducted a Fact Finding Conference on June 6, 2012 concerning the banked transformer and the subsequent argument between Plaintiff and his brother.

On June 5, 2012, Hamilton prepared a written statement.  Billy Byrd, the Union Steward, notified Don Reilly, the Business Manager for the Union.  Reilly instructed Byrd to attend with Hamilton and take notes.

On June 6, 2012, Duke conducted its Fact Finding Conference, interviewing various Duke employees.  Mearns and Greve took notes which were combined and typed up.  Witnesses Pat Becknell and Chuck Gundrum said that Plaintiff called Grady "a chump," "a piece of shit," and that Plaintiff was in Grady's face.  They further indicated that Plaintiff threatened Grady and said we will solve it at 3:31 in the parking lot, while pointing his fingers and overbearing Grady.  They stated that Grady tried to explain and remained calm.  Roger Heck similarly testified that he heard Hamilton call his brother a chump, and say, "I will meet you in the parking lot after work," implying a physical altercation.  He said that Grady walked away but that Plaintiff kept following him, telling him he was a "'suckass' and not half the lineman I am."

During the Fact Finding Conference, Mearns suspended Plaintiff indefinitely. Byrd shared his notes with Reilly via facsimile on June 7, 2012; Reilly reviewed those notes as well as Hamilton's written statement.

5

Later in June 2012, Ken Toebbe, who was Mearns' direct supervisor, Lisa Gregory, Director of Labor Relations, Jerri Garmon of Human Resources, and Mearns all met to discuss the disciplinary action to be taken against Plaintiff.  All four decided to terminate Hamilton's employment.  They testified that they made their decision in part based on Hamilton's prior disciplinary record, which included other instances of unsafe work practices and hostile work environment, as well as based on the information gathered during the Fact Finding Conference.  Plaintiff partially disputes the extent of his disciplinary record, but concedes that he previously was referred for conflict resolution counseling after a prior altercation.  On or about June 20, 2012, Lisa Gregory called Reilly to notify him of the termination decision.

A 2009-2014 CBA between Duke and the Union governed Plaintiff's employment and termination.  Under the CBA, the right to impose discipline including termination for "proper and legitimate reasons" was reserved to Duke.  (Hamilton Depo., Ex. 1 at 11, Article I, §9(a)).  Duke also retained the ability to "adopt or revise any work methods and procedures."  Among the policies and procedures adopted by Duke were a Code of Business Ethics, Harassment Policy Work Place Security Procedure, and a Threats and Violence in the Workplace Policy.

The CBA contains a three-step grievance process leading up to arbitration.  In termination cases, the parties may elect to proceed directly to the Third Step, consisting of a meeting between the parties, with management, the Union's grievance committee, and the grievant.  On June 27, 2012, Ken Toebbe met with Reilly and Hamilton, among others, and informed them of the termination decision.  During the meeting, with Hamilton's agreement, Reilly articulated a verbal grievance and requested to advance

6

to a Third Step meeting in order to obtain a quicker resolution.  Reilly also requested a written termination letter as required by the CBA, as well as a list of witnesses that Duke had interviewed.

Hamilton provided Reilly with a written statement outlining his position immediately after the termination meeting.  (Doc. 37-5).  On July 2, 2012, Reilly sent a letter to Lisa Gregory, again requesting a copy of the June 29 termination letter and a list of the witnesses that Duke had interviewed.  In response, Duke sent Hamilton a termination letter dated June 29, 2012.  The letter states: "Based on the totality of evidence and prior corrective action you have received, the Company has concluded that you violated Company Policy, engaged in unsafe work practices, and failed to follow your supervisor's instructions."  (Doc. 37-6).  Reilly next prepared and submitted a written Third Step grievance dated July 9, 2012, in which he asserted that Hamilton had been unjustly terminated and requested reinstatement and lost wages and benefits. (Doc. 37-8).

On August 1, 2012, Reilly attended a Third Step Grievance meeting with Hamilton and a grievance committee.  At that time, Lisa Gregory stated Plaintiff was being terminated for violating company policy, threatening employees, engaging in unsafe work practice (leaving the transformers banked), creating a hostile work environment, and failing to follow the supervisor's instructions (to unbank the transformers).  Danny Amshoff, as part of the Union's grievance committee, also attended and took notes.  During the meeting Reilly offered Hamilton the opportunity to ask any additional questions or to make comments. On the same date, Reilly interviewed a list of witnesses that Hamilton provided to him, including Pat Becknell,

7

Ray Edwards, John Hoskins, Chuck Gundrum, and Mike Weiss. Reilly also spoke with Grady Hamilton by telephone. While Reilly chose not to interview every person who worked in the district, the only witness identified by Plaintiff and not interviewed by Reilly was Marc Lewis. Reilly believed that the witnesses he interviewed confirmed Duke's account of the reasons for termination; Becknell and Gundrum both told him that Plaintiff pursued and threatened his brother. (Reilly Depo., Doc. 37 at 72).

On August 20, 2012, Gregory sent Reilly a formal written response, denying the Third Step grievance and confirming the termination. (Doc. 37-13). The Union has the right to request arbitration within 30 work days of receipt of the Third Step response. As Business Manager, Reilly makes the determination of whether to pursue arbitration. In order to preserve Plaintiff's rights, Reilly had provided initial notice that the Union would pursue Hamilton's grievance to arbitration.

On August 24, 2012, Reilly formally requested additional information concerning the termination. Reilly met with Gregory to review the Fact Finding conference notes and policies that Duke claimed Hamilton had violated. On August 30, 2012, Reilly wrote Gregory to confirm receipt of the information that he had requested.

On August 31, 2012, after consulting with the President and the Executive Board of the Union as well as the current and former Union International Representative, Reilly decided not to pursue Plaintiff's grievance to arbitration and notified Duke and Hamilton of that decision. (Doc. 37-16). Reilly's letter explained that the witness statements conflicted with Hamilton's statements, and gave Hamilton 10 days to respond. Plaintiff spoke with Reilly but chose not to file any formal response. In a final letter dated

October 2, 2012, Reilly notified Duke and Hamilton that the Union was dropping the grievance.  (Doc. 37-17).

## II.  Analysis

### A.  Standard of Review

On summary judgment, a court must determine whether there is any genuine issue as to any material fact in dispute.  *See* Rule 56(c), Fed. R. Civ. P.  In a motion for summary judgment, a court "must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party."  *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Id.* (quoting Fed.R.Civ.P. 56(c)) (internal quotation marks omitted).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party."  *Id.*  In this case, summary judgment should be granted to the Plaintiffs based upon the uncontested evidence filed in support of their motion.

### B.  Duke's and the Union's Motions

Plaintiff's claims fall under §301 of the Labor Management Relations Act ("LMRA"), which authorizes employees to bring hybrid suits against their employers and labor organizations. An employee like Plaintiff who is subject to a CBA may not sue his employer unless he first exhausts any grievance or arbitration remedies set forth in the

CBA, and judicial review of that process is narrow. *DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 163-164 (1983). However, when the Union representing the employee acts "in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation," then the employee can file a type of hybrid suit against both his employer and his union, "notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* To prevail under §301, a plaintiff must prove <u>both</u> that his discharge was contrary to the CBA and that the union breached its duty of fair representation. *See Williams v. United Steelworkers of America*, 2011 WL 2135179 (S.D. Ohio, May 27, 2011)(granting summary judgment where plaintiff failed to prove either prong). Duke and the Union argue persuasively that Hamilton cannot prove either element of his claim in this case.

### 1. Breach of Fair Representation

In order to establish that the Union has breached its duty of fair representation, Plaintiff must prove that the Union acted arbitrarily, capriciously, or in bad faith. Unless the Union has breached its duty, both the Union and the employer are entitled to a judgment of dismissal. *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)(establishing the right of an employee to file suit where the plaintiff has been prevented from exhausting his rights under the CBA by the union's breach of its duty of fair representation). The steep burden faced by would-be plaintiffs in §301 cases was aptly described in *Garrison v. Cassens Transport Co.*, 334 F.3d 528 (6th Cir. 2003):

> There is no requirement….that the grievance process be "error-free." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 571, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).
>
> With regard to the arbitrary prong, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions,

10

the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (citation omitted). Mere negligence on the part of a union does not satisfy this requirement. *United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372–73, 376, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). Moreover, ordinary mistakes, errors, or flaws in judgment also will not suffice. *See Walk v. P\*I\*E\* Nationwide, Inc.,* 958 F.2d 1323, 1326 (6th Cir.1992) (citations omitted). That is, "an unwise or even an unconsidered decision by the union is not necessarily an irrational decision." *Id.* In essence then, to prevail, a plaintiff has the difficult task of showing that the union's actions were "wholly irrational." *O'Neill,* 499 U.S. at 78, 111 S.Ct. 1127. The "wholly irrational" standard is described in terms of "extreme arbitrariness." *Black,* 15 F.3d at 585 ("[T]he relevant issue in assessing a Union's judgment is not whether it acted incorrectly, but whether it acted in bad faith, or extremely arbitrarily, or discriminatorily.") (internal quotation marks and citation omitted).

*Id.*, 334 F.3d at 538-39.

Both Duke and the Union argue that Hamilton cannot prove that the Union breached its duty.  "[A] union does not breach its duty of fair representation merely because it determines that a grievance lacked merit, regardless of whether a judge or jury ultimately agrees."  *Vaca v. Sipes*, 386 U.S. at 192-193.  To establish bad faith by the union, a plaintiff must provide "substantial evidence of fraud, deceitful action or dishonest conduct."  *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of America v. Lockridge*, 403 U.S. 274, 279 (1971).   But even proof of bad faith may not be sufficient, unless the grievance process was "seriously" affected, to the detriment of the employee.

Once a plaintiff proves that the Union acted in bad faith or in an arbitrary or discriminatory manner, however, the plaintiff must also prove that the Union's actions tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach. *Black,* 15 F.3d at 585. Moreover, the impact of the Union's breach on the outcome of the grievance proceeding must have been substantial:

to establish a breach of fair representation, the plaintiff must meet the onerous burden of proving that the grievance process was "seriously flawed by the union's breach of its duty to represent

11

employees honestly and in good faith and without invidious
discrimination or arbitrary conduct.
*Id.* (citation omitted).

*Dushaw v. Roadway Exp., Inc.*, 66 F.3d 129, 132 (6th Cir. 1995). Thus, Plaintiff must

prove that the Union's failure to pursue his claim in arbitration "more than likely affected

the outcome of the grievance procedure." *Id.*

On the record presented, Hamilton falls far short of his high burden of proving

that the Union breached its duty of fair representation to him. Hamilton admits that the

Union filed a grievance on his behalf, but argues that it "failed to conduct any

meaningful investigation." (Doc. 1 at ¶13). A failure to conduct any investigation might

constitute a breach of fair representation (assuming that the lack of investigation

affected the outcome), but that is not what happened here.

Rather, the record shows that Reilly (1) conducted an investigation and

participated in a termination meeting in which Toebbe explained the grounds for

termination; (2) reviewed Billy Byrd's Fact Finding Conference notes; (3) reviewed

Hamilton's statement; (4) personally interviewed six persons, including all but one of the

persons Hamilton asked that he interview; (5) attended a Third Step Grievance meeting

with Hamilton and Duke's management team; (6) met with Lisa Gregory to review the

Fact Finding Conference interview notes as well as specific policies on which Duke was

relying for the termination decision; (7) consulted with the President and Executive

Board of the Union; and (8) consulted with Ted Robison, International Representative of

the Union, and Gary Koinglesmith, a retired former International Representative of the

Union, who had a lot of experience with arbitration proceedings. Any mistake or error in

judgment by the Union in its determination not to pursue arbitration is insufficient to

show a breach of its duty.  In other words, the issue of whether Hamilton was or was not actually guilty of terminable offenses is separate from the inquiry of whether the Union violated Hamilton's right to fair representation.

Hamilton suggests that the Union's investigation was woefully inadequate.  He testified that he did not believe the investigation was "meaningful" because Reilly failed to interview all eighteen employees who worked in the district.  (Doc. 53 at 190-191, 193-194).  But a request that Reilly interview everyone in the entire district was not a reasonable demand, and was not required for a meaningful investigation. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994)(holding that "[a] union does not…have to exhaust every possible remedy requested by a member facing disciplinary action."); *Garrison*, 334 F.3d at 540-541 (no breach where union did not prepare a defense that it believed was inapplicable, and noting that such a "tactical decision" is "subject to deference.").

In the alternative, Plaintiff argues that Reilly should have interviewed every person who worked on the State Street job.  However, Reilly did interview everyone who had worked on the State Street job except for Marc Lewis.  A failure to interview Lewis does not amount to a breach of the duty of fair representation.  *See Armstrong v. Chrysler Corp.*, 972 F. Supp. 1085, 1090 (E.D. Mich. 1997)("The Union was under no obligation to personally interview every witness to the incident" and its failure to do so did not render its investigation arbitrary, irrational or perfunctory).

Duke had already interviewed Marc Lewis during the Fact Finding Conference. Lewis's statements were recorded during the conference and heard by Billy Byrd, who also took detailed notes.  Reilly reviewed all relevant notes concerning Lewis's

13

statements. Hamilton cannot show that an additional interview would have impacted the outcome of his case. Lewis testified that Plaintiff "kept getting louder and Grady was quiet," that Hamilton had asked him and Hoskins to unbank the transformers, but that they did not guarantee they would do it, and that Hamilton never followed up with them. Lewis also testified that he "hid" when Hamilton and his brother began arguing, and had nothing to add in Plaintiff's favor. Thus, there is no evidence that Reilly's failure to personally interview Lewis had any impact on the Union's decision not to arbitrate, or the ultimate termination decision.

Contrary to Plaintiff's apparent belief, a union is not obligated to pursue every grievance to arbitration. Persisting in his claim that the Union acted in "bad faith," Hamilton contends that Reilly was "dishonest" in three specific ways: in the exercise of Reilly's judgment that insufficient merit existed to pursue arbitration, and on two additional occasions during the investigatory process.

First, Hamilton alleges dishonesty to the extent that Reilly testified that to determine whether or not to pursue arbitration, he considers: "Is there any merit to the case?" (Reilly Depo., Doc. 37 at 31:21-23, emphasis added). He subsequently testified that he reviews all evidence before exercising his judgment as to whether "there is merit to the case" or whether he believes he can make a "valid argument." (Doc. 38 at 244, 245-246). Heavily relying upon a single word in Reilly's initial deposition testimony, Plaintiff argues that Reilly was required to pursue arbitration against all odds, so long as "any" argument could be made. Plaintiff contends that an issue of material fact exists concerning whether Hamilton's grievance had "any" merit. Hamilton suggests that Reilly "lied about the state of the evidence that existed…in order to avoid fulfilling his

14

fiduciary duties" to pursue arbitration. (Doc. 62 at 19). In terms of the basis for "any" meritorious argument, Hamilton falls back upon his underlying mix of factual and legal arguments that Duke got it wrong, and that he was not guilty of the multiple offenses with which he was charged.

The Court is not persuaded. Plaintiff's position would divest the Union of any discretion, so long as some possible "merit" to the grievance existed. Plaintiff's entire argument runs counter to §301 of the LMRA. *See generally Vaca*, 386 U.S. at 195 ("…a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious….").

> [M]erely characterizing a union's conduct as "arbitrary," "perfunctory" or demonstrative of "bad faith" is insufficient to withstand summary judgment. Rather, to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith. *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299 (1971).

*Damphousse v. Great Lakes Steel*, 219 F. Supp.2d 833, 837 (E.D. Mich. 2002)(quoting *Kaiser v. United States Postal Service*, 785 F. Supp. 6468, 660 (E.D. Mich. 1992)(additional internal citation omitted)).

In context, without parsing and overemphasizing a single phrase, Reilly's testimony was not "dishonest" and the record as a whole can admit of only one conclusion. Reilly retained the discretion to determine whether or not the Union should pursue arbitration based upon his judgment concerning whether sufficient merit existed to continue pursuing the grievance. The Union reasonably exercised that judgment. No reasonable jury could find that the Union violated its duty of fair representation when Reilly determined that the grievance was not sufficiently meritorious to continue to arbitration. Reilly provided Hamilton with rational reasons for his decision. Those

15

reasons may not have been to Plaintiff's liking, but cannot be viewed as so outside the realm of reasonableness as to be arbitrary and capricious or in bad faith. "[A]n unwise or even an unconsidered decision by the union is not necessarily an irrational decision." *Garrison*, 334 F.3d at 538 (quoting *Walk v. P*I*E* Nationwide, Inc.,* 958 F.2d at 1236). In general, "mistakes, errors, poor judgment, inadequate, or even negligent representation" are insufficient to demonstrate a breach of the duty of fair representation*. Hayes v. UPS*, 327 Fed. Appx. 579, 586 (6th Cir., May 19, 2009)(citing *Garrison*).

Aside from contesting Reilly's judgment about the quality of Duke's evidence and/or the "merit" of his defense, Plaintiff asserts that the Union's decision not to arbitrate breached the Union's duty because Reilly was "dishonest" in two respects during the investigation. For example, Plaintiff argues that Reilly was "dishonest" when he represented that one of the five witnesses interviewed by Reilly requested that Hamilton not be present during the interviews. Two of the witnesses, Hoskins and Edwards, testified that they did not make any such request. Hoskins further testified that he did not recall anyone making the request, notwithstanding Reilly's contemporaneous note to that effect, and that such a request would have been "inconsistent" with the relationship that the five witnesses had with Hamilton. However, Hoskins also testified that he had no present recollection of whether any witness had made the request, that he had no reason to believe that Reilly's notation was false, and that he would not know if one of the other witnesses made the request. (Hoskins Depo. at 20-22, 36, 39, 40-42).

16

The record does not demonstrate dishonesty by Reilly in conducting the witness interviews.  Hamilton did not depose the other three witnesses (Gundrum, Becknell, or Weiss), and has presented no evidence that one of them did not make the request. Moreover, even if Hamilton had shown that Reilly misrepresented the reason for excluding him from the interviews, any such misrepresentation would be immaterial. There is simply no evidence that Reilly made any type of false record of the substance of the witness statements, which corroborated Duke's charges and were inconsistent with Hamilton's own statements.  The witnesses stated that the substance of Reilly's August 1, 2012 notes concerning their descriptions of the events was accurate.  Thus, there is no evidence at all that interviewing the witnesses outside of the presence of Hamilton tainted the grievance process or the outcome of the arbitration decision.

The last assertion of "dishonesty" that Plaintiff uses to support his claim of "bad faith" by the Union is his contention that Reilly lied when he stated on August 30, 2012 that he had "received the information" from Duke that he requested in his August 24, 2012 letter.  But as with Plaintiff's other assertions of "dishonesty" or "bad faith," the record reveals the absence of any genuine issue of material fact.  Reilly's letter of August 24, 2012 specifically requested: (1) "in regard to 'violation of company policy,' statements from witnesses affirming the company's position that Mr. Hamilton created a hostile or harassing environment at work; (2) "in regard to engaging in 'unsafe work practices,' examples of how Mr. Hamilton's work practices created an unsafe environment," and (3) "in regard to failure 'to follow his supervisor's instructions,' a written statement from his supervisor demonstrating Mr. Hamilton's insubordination." (Doc. 37-14).  Duke responded by providing witness statements and other information.

17

Reilly's subsequent August 30, 2012 stated that he had "received the information" requested, and confirmed that Reilly "was afforded full disclosure to the Company's record of witness statements and any additional information needed to make a sound decision in this case." (Doc. 15).

It is undisputed that Reilly did not actually receive any "written statement" by the supervisor, Greve, because no such statement existed then or now.  Plaintiff therefore attacks as "dishonest" Reilly's representation that he had "received the information" - because Reilly could not have received a non-existent statement.  (Hamilton Depo. at 248-249).  Although Hamilton accuses Reilly of a "negligent" misrepresentation that he had received "all" of the evidence requested, mere negligence is insufficient to demonstrate bad faith. *United Steelworkers of Am. v. Rawson*, 495 U.S. at 371.  More to the point, though, the fact that Reilly stated that he "received the information" that he requested does not amount to a showing of bad faith or dishonesty during the investigation.  Rather than interpreting the statement as a "false" representation that he received a non-existent letter, it is far more reasonable and rational to interpret the statement as acknowledgment of receipt of all *existing* information responsive to his prior requests. Aside from that more rational construction, it bears noting that Reilly was not a trained lawyer or professional wordsmith. "[A] union's representative 'cannot be held to the same standard as that of [a lawyer]' because they do not have the same training…." *Hayes v. UPS*, 327 Fed. Appx. at 586 (quoting *Garrison,* 334 F.3d at 539). In short, there is no evidence of dishonesty by Reilly, or of arbitrary and capricious conduct or bad faith by the Union.  As there is no evidence that the Union breached its

18

duty of fair representation when it chose not to pursue the denial of the Third Step grievance to arbitration, both Defendants are entitled to judgment as a matter of law.

### 2.  Breach of Contract Claim

Hamilton's claim against Duke is "interlocked" with his breach of fair representation claim; therefore, the failure of his claim against the Union ends his claim against Duke.  *See White v. Detroit Edison Co.*, 472 F.3d 420, 425 (6th Cir. 2006). Even though both Defendants are entitled to judgment as a matter of law based upon Plaintiff's inability to show a breach of the duty of fair representation, both Defendants are also entitled to judgment because Hamilton also fails to show a genuine issue of material fact exists regarding whether his termination was proper under the CBA. Under the CBA, Duke retained the right to terminate employees for any "proper and legitimate" reason.    The Court concludes that the termination was "proper and legitimate" and therefore not in breach of the CBA.   Duke conducted a complete investigation that supported the four reasons cited by Duke for the disciplinary action: (1) Hamilton's creation of an unsafe work practice when he left two transformers banked; (2) his failure to return and correct that condition as instructed; (3) his engaging in a heated argument and threatening a physical altercation while at work; and (4) his prior disciplinary history. The mere fact that Hamilton asserts defenses to most of the charges does not mean that Duke violated the CBA.  As Plaintiff himself puts it, "[t]he question to ask is whether Duke acted in good faith in its termination decision."  (Doc. 62 at 4-5).  Ample record evidence drives the conclusion that Duke's decision was reasonable and in good faith, and therefore "proper and legitimate."

### a.  Leaving the Transformers Banked at State Street

Hamilton argues that an issue of fact exists as to whether he violated "company policy" or created an unsafe work practice by leaving the two State Street transformers banked on May 15.  There is no dispute that his supervisor did not instruct him to leave the transformers banked, but he argues that no written workplace policy existed that required him to unbank the transformers.  Hamilton testified that "on many occasions" transformers are temporarily banked "in trouble situations" and when he is instructed to do so by "someone with a higher authority than I have."  (*See* Hamilton Depo., Doc. 53 at 162).  In fact, Reilly had argued on Hamilton's behalf during grievance proceedings, and later testified, that it was not "uncommon" to leave transformers banked for as long as a couple of weeks.  (Reilly Depo., Doc. 38 at 333-334).  Co-worker Hoskins also testified that leaving transformers banked is not really "a big deal" for which he thought an employee should be terminated.  (Doc. 45 at 18).  However, Reilly further testified that it was a violation of policy and an unsafe work practice for Hamilton to have left the transformers banked on May 15.  Reilly explained that the violation occurred because Plaintiff was not instructed to leave them banked (a fact that Plaintiff does not dispute) and because he failed to inform a supervisor, make a note on the drawing, or in any other way notify Duke that he had left them banked, with the result being that the transformers were left banked and unattended for weeks.  (Doc. 38 at 335).  The unknown and unattended condition created a safety hazard.  (*Id.*).

To support the violation, Duke cited a written policy against banking published by Cinergy, the entity for which Hamilton worked prior to Duke's acquisition of Cinergy.  Hamilton protests that the policy was never formally adopted by Duke, and that there

was no written standard that explicitly prohibited banking in 2012.  Duke has offered evidence that it had a practice of notifying the Union of any changes to Cinergy policies, and that no such notice was given concerning the existing "no banking" policy.  (Doc. 71-1). However, whether or not the prior work standard was formally adopted following the merger is irrelevant.   Hamilton's own testimony implied that he would leave transformers banked only if directed to do so.  Hamilton was not instructed to leave the transformers banked on May 15, and that leaving them banked and unattended without anyone's authorization or knowledge was contrary to customary safe work practices, as well as prior written policy under Cinergy that had not been replaced with any contrary written guidance.  Multiple witnesses testified to that fact.  Notwithstanding Hamilton's argument that he should not have been terminated because it wasn't "a big deal," Duke had a strong basis for finding that Hamilton committed unsafe work practices by leaving the transformers banked, without express instruction, without notifying his supervisor or anyone else, and in violation of Duke's general custom and policy.  Thus, Duke did not exhibit bad faith by citing the violation as one of several reasons for Hamilton's termination.

### b.  Failure to Follow Supervisor's Instructions

It is undisputed that Hamilton was instructed by his supervisor on May 16 to return to the job to unbank the transformers, and that although Hamilton attempted to delegate the task to others, no one performed the assigned task for two weeks, until the condition was discovered.  The June 29 letter describes Hamilton's disciplinary violation as a "fail[ure] to follow your supervisor's instructions," although the parties here use the short-hand term of "insubordination."

21

Hamilton argues that he was not insubordinate because he did not think he had sufficient time to simultaneously obey two conflicting instructions from Greve.  Hamilton had been instructed to attend a safety meeting, and testified that he did not believe he could timely attend the meeting if he first unbanked the transformers.  However, Greve testified that he instructed Hamilton to fix the transformers first, and that it would have been physically possible to perform both tasks even considering the distance between State Street and the safety meeting location.  Whether or not time permitted Hamilton to unbank the transformers and return to the meeting by its start time is not a genuine issue of material fact, because even if Hamilton was correct in his time estimate, that did not wholly excuse him from complying with his supervisor's instruction.

Since Greve allegedly told Hamilton to "handle it" when he pointed out the logistical difficulty, Hamilton argues that his decision to delegate the task of unbanking the transformers to Hoskins and Lewis did not provide a "proper and legitimate" basis for terimination.  However, Duke did not breach the CBA by disciplining him for failing to comply with the instruction.  Hamilton admittedly was instructed to perform a task that he neither completed nor ensured completion of.

The parties dispute whether Hamilton had authority to delegate the task, but that disagreement is not so material as to preclude summary judgment.  There is no dispute that Hamilton did not inform Greve that he had delegated the task, and that Hamilton did not confirm that his coworkers had completed the assigned task.  Thus, even assuming that Hamilton was permitted to delegate the direct order, it was not unreasonable for Duke to find that he failed to comply with his supervisor's instructions when he failed to ensure that the task was completed on May 16, 2012.  Hamilton argues that he did not

22

"willfully" disobey the supervisor's request, but Duke reasonably concluded that he failed to complete a very specific order. The end result was that the transformers were not unbanked until two weeks later, on May 31, 2012, when their condition was discovered by happenstance. In other words, Hamilton's version of the events of May 16 does not alter the reasonableness of Duke's finding.

### c. Prohibiting Workplace Violence and Threatening Behavior

Hamilton admits that he and his brother engaged in a loud argument and exchanged "cuss words." However, Hamilton claims that – contrary to the reports of other witnesses and Duke's finding – his brother Grady approached him. He disputes Duke's finding that he threatened Grady with physical harm, and argues that the fact that he engaged in a heated argument did not itself constitute a violation of the company policy, because no actual violence occurred and other arguments at the workplace did not result in discipline.

Again, the Court concludes that Duke's finding that Hamilton was the aggressor in a loud and threatening argument did not violate the CBA. Duke's finding was supported by the statements of Pat Bucknell and Chuck Gundrum, both of whom related that Hamilton called Grady a "chump," a "piece of shit," and that Hamilton told Grady that they would resolve their argument "at 3:31" in the parking lot, while Hamilton pointed his finger and displayed threatening behavior. Both witnesses related that Grady remained calm. A third witness, Roger Heck, confirmed a similar version of events, stating that he interpreted Hamilton's remarks as a threat of physical harm. Thus, the record supports Duke's good faith belief that Hamilton committed the asserted violation.

23

### d.  Prior Disciplinary Record

The termination letter dated June 29, 2012 states:  "Based on the totality of evidence *and prior corrective action* you have received, the Company has concluded that you violated Company Policy; engaged in unsafe work practices, and failed to follow your supervisor's instructions."  (Doc. 37-6, emphasis added).  In a footnote in his response in opposition to summary judgment, Plaintiff asserts that Defendants' reference to his "prior disciplinary record" "did not exist in the June 29, 2012 letter" and constitutes an "after-the-fact justification" for his termination.   (Doc. 62 at 20 n. 1). Plaintiff's argument is flatly refuted by the referenced letter, as well as other evidence of record. (See Doc. 37-20, letter dated August 23, 2011 imposing five-day suspension and referencing prior suspension, warning Plaintiff that "any violation of Duke Energy's safety practices, procedures, or any failure to comply with directives will result in your immediate discharge.")(*see also* Toebbe Depo. Doc. 40 at 20, 36-44; Gregory Depo., Doc. 41 at 42; Mearns Depo. Doc. 39 at 107).

### III.  Conclusion and Order

For the stated reasons, **IT IS ORDERED** that Defendants' motions (Docs. 54, 55) be **GRANTED,** that judgment be rendered in favor of both Defendants as a matter of law, and that this case be closed.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

24